IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| DENISE WARD, | ) Civil Action No. 4:08-1084-MBS-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

_____This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## PROCEDURAL HISTORY

Plaintiff, Denise Ward, filed her application for DIB on August 2, 2005 (Tr. 57). Plaintiff alleged disability due to depression, panic attacks, migraine headaches, confusion, lack of focus, dizziness and nausea, and body aches Plaintiff's application was denied initially and on reconsideration (Tr. 30-33, 38-41), and she requested a hearing (Tr. 42) before an administrative law judge (ALJ). A hearing was held on January 12, 2007, at which Plaintiff appeared with counsel,

Beatrice E. Whitten, and testified, along with her husband, Coleman W. Dangerfield, Jr., and a vocational expert, Luther D. Pearsall. (Tr. 332-356). The ALJ issued a decision dated August 20, 2007, denying benefits (Tr. 10-27). The ALJ concluded that, while Plaintiff had severe impairments of major depressive disorder, anxiety, and headaches which precluded her return to her past relevant work, she retained the mental and physical residual functional capacity to perform a range of unskilled, medium, low-stress work, and that such work existed in significant numbers in the national economy. On February 8, 2008, the Appeals Council denied Plaintiff's request for review (Tr. 5-8), thereby making the ALJ's decision the Commissioner's final decision for purposes of judicial review under section 205(g) of the Act, 42 U.S.C. § 405(g). See 20 C.F.R. 404.981. This action was filed on March 31, 2008.

## FACTUAL BACKGROUND

Plaintiff was fifty-two (52) years old at the time of the alleged disability onset date and fifty-four (54) years old at the time of the ALJ hearing. She completed high school and two years of college toward an associate's degree in interior design but did not complete the degree. She worked for over 14 years as an administrative assistant before quitting to become a housewife (Tr. 66, 137, 335). Her most recent work experience, since 1999, was as an administrative secretary, center coordinator, interior designer, office manager, and senior administrative assistant (Tr. 60). Plaintiff alleges disability since she stopped working on September 25, 2004.

## DISABILITY ANALYSIS

The Plaintiff's arguments consist of the following:

The ALJ:

1. Did not properly consider the medical opinions of plaintiff's treating physicians;
2. Abused his discretion by not performing a proper listing analysis; and
3. Failed to consider whether the plaintiff's combined impairments were of equal medical significance to a listed impairment.

(Plaintiff's brief, page 1).

In the decision date August 20, 1997, the ALJ found the following:

1. The claimant meets the insured requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since September 25, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq.).

3. The claimant has the following severe impairments: a major depressive disorder, anxiety, and headaches (20 CFR § 404.l520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a significant range of unskilled, medium work. Specifically, the claimant was able to lift and carry up to 50 pounds occasionally and 25 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day. However, the claimant is limited to work which does not require any climbing; exposure to hazards; work on a production line or work performed at a production rate pace; or more than occasional exposure to the general public. Additionally, the claimant is limited to low stress work. Such residual functional capacity is well supported by the weight of the evidence of record.

6. As a result of her residual functional capacity as described above, the claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on August 16, 1952 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2004, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-27).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence[1] and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept

---

[1]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must

5

be upheld if supported by substantial evidence and proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of disability by showing she was unable to return to her past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the Plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the Plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.


**MEDICAL REPORTS**

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case.

Treatment notes showed that Plaintiff had a history of conservative treatment over several years for depression, anxiety, and headaches, with her family practitioner, H. Phillip Morris, Jr., M.D., beginning in June 2000. (Tr. 157-258). In June 2004, Plaintiff requested to be excused from work for three months on Family Medical Leave to "work on diet and get herself straightened out."

Dr. Morris placed her on medical leave for one month. He noted that if she was not improved in two weeks she would be referred to a psychiatrist "because we have not been able to ever break through these cycles which I have treated her now for the fourth time" (Tr. 176). Dr. Morris saw her four more times between June and September 2004, when he recommended that she see a therapist (Tr. 170). Plaintiff did not see Dr. Morris again until February 2005, when he referred her for psychiatric testing because "she has decided she has adult ADD. Says she gets multiple projects going on, can't finish any of them. Sort of flips from thing to thing, can't focus, and now that she is able to get good rest she realizes it. Also denies being depressed. Headache better." (Tr. 167) Plaintiff was referred by Dr. Morris to Matt F. Butryn, Ph.D. for neuropsychological testing for ADHD (Tr. 167).

Dr. Butryn evaluated Plaintiff over the course of four visits between March and May 2005(Tr. 137-40). He noted that objective clinical tests results of her intellectual functioning, academic performance, and concentration/attention were below expectation based on her education, work history, and relatively high functioning during most of her adult life. He suggested that her test profile was "consistent with poor effort and motivation" and "possible intention to present herself as worse off than she really is and someone who is coping with significant emotional and, in particular, anxious symptomatology." (Tr. 138). He found that she was "severely incapacitated by depression and especially anxiety." (Tr. 139). He diagnosed generalized anxiety disorder and major depressive disorder, and referred her to psychiatrist, Edward J. Fisher, Jr., M.D., and Jodi L. Carlton, M.Ed., L.P.C., for medication management and counseling, respectively (Tr. 117-120, 132-140).

Dr. Fisher's initial mental status examination of Plaintiff in May 2005 showed she appeared anxious and depressed, but was fully oriented and had good eye contact, average intellectual functioning, fair insight and judgment, goal-directed, spontaneous, and organized thought processes,

and GAF scores in the "moderate" range (Tr. 108-15). Ms. Carlton thought bipolar disorder might explain Plaintiff's symptoms (Tr. 107, 136). By June 2005, Plaintiff felt like her "old self," and was improving on medications, "doing very well," and exercising daily, but was worried about "going to an 8 to 5 job" (Tr. 105, 107). The following month, she reported worrying about the possibility of having to return to full-time work, becoming confused and disoriented and "having a meltdown" during a trip to Washington D.C., and continuing migraine headaches (Tr. 103, 133).

In August 2005, she presented to neurologist Terry L. Wimpey, M.D., Ph.D., for further evaluation of her headaches, stating that her headaches started in childhood and had worsened over the past six months. An MRI of her head was normal (Tr. 131) and examination revealed that she was alert and oriented and had a normal gait, full range of motion of her neck, full strength and normal sensation in all four limbs, symmetric reflexes, fluent language, normal naming and repetition skills, normal short-term memory, and intact cranial nerves (Tr. 129-30). Dr. Wimpey prescribed a different headache medication and noted the possibility that she was having "rebound" headaches from medication overuse (Tr. 129-30).

There are no medical records in the case record indicating that she sought treatment again From October 2005 until June 2006, after she relocated from Georgia to South Carolina.

On June 23, 2006, and June 30, 2006, she presented to Berkeley Family Practice complaining of fatigue or a moderate lack of energy and elevated blood pressure for the past three months, and elevated liver enzymes of unknown etiology for the past ten years and related that she had a history of depression and was on Prozac and Estradiol (Tr. 313-316). When she followed-up at Berkley on August 2, 2006, her main complaint was bipolar and panic disorder (Tr. 311). She reported that she had withdrawn from friends and family, had tearful spells and hypersomnia, and frequently felt

overwhelmed and had panic attacks whenever she was in an automobile. Her husband stated that she still had migraines several times a week (Tr. 310-311). The provider at Berkeley changed her headache medication and referred her to psychiatrist Phillip Robbins, M.D., of Oasis Christian Counseling (Tr. 311-312, 341, 345).

On September 19, 2006, Plaintiff was admitted to a psychiatric hospital after her husband called Oasis Christian  Counseling reporting that Plaintiff has now declined in functioning to the point she is willing to go into the hospital to get her medication stabilized." (Tr. 324). Plaintiff also experienced an allergic reaction to one of her medications. (Tr. 323-324).

Plaintiff was admitted to Palmetto Lowcountry Behavioral Health for a six-day course of hospital treatment. Plaintiff was admitted for bipolar, depression, inability to function and suicidal ideations. Plaintiff's Prozac was discontinued and she was started on Lithium, Metformin, Abilify and Ambien. She was discharged with a diagnosis of bipolar affective disorder, type 2, most recent episode depressed, severe without psychosis, diabetes, hypertension, allergic reaction to Lamicatal, depression, and a GAf on discharge of 68-70. (Tr. 301). An appointment with Dr. Robbins and her counselor was made upon discharge.

Plaintiff continued treatment with Dr. Robbins. It was noted on November 9, 2006, that Plaintiff's husband called and stated that Plaintiff  "ran away from home last night" to Georgia to stay with family because she did not want to follow the medication strategies outlined for her the day before and that she had a history of noncompliance. (Tr. 317).

**Medical Opinions**

As previously outlined, Dr. Butryn conducted a battery of clinical tests over the course of four visits with Plaintiff in March - May 2005, and  diagnosed her with generalized anxiety disorder,

moderate to severe, and major depressive disorder, recurrent, moderate to severe, and set forth more specific limitations, as follows: her ability to understand and carry out simple, but not complex, instructions and tasks was intact; her capacity for verbal comprehension and expression was intact; her ability to interact with other people was limited but not precluded; her ability to follow work routines and complete production expectations was minimal (due to slow work pace, lack of motivation, and emotional instability); her ability to pay attention and concentrate was limited; she would likely decompensate under stressful situations; she was independent in her activities of daily living except for constant prompting and assistance from her husband; she might have difficulty with prolonged sitting, standing, or lifting and carrying heavy loads due to decreased stamina; and she would be able to manage benefits in her best interest (Tr. 137-140). Three months later, on August 22, 2005, Dr. Butryn provided another brief summary of his evaluation of Ms. Ward to the state agency disability adjudicator. He reconfirmed his diagnoses and the specific limitations as set forth above and opined that her prognosis was "minimal to poor given the lifelong course of these problems and their severity level" (Tr. 117).

Ms. Carlton (treating licensed professional counselor): On August 24, 2005, Ms. Carlton opined that Plaintiff could understand and perform simple and brief tasks, but would be unable to perform complex or lengthy tasks due to anxiety, memory loss, mental confusion, mood swings, and difficulty concentrating, and that her ability to interact socially was also limited (Tr. 134). A few months later, in October 2005, she completed a "mental impairment questionnaire" indicating that she had counseled Plaintiff seven times between May and October 2005 for "possible bipolar disorder," and that there had been a "moderate" response to treatment. She stated that Plaintiff's mental condition likely contributed to her headaches and that the prognosis was "very guarded." She

concluded Plaintiff had "moderate" restriction in activities of daily living, "marked" limitations in maintaining social functioning, "extreme" deficiencies in concentration, persistence, or pace, and four or more episodes of decompensation that were not "clearly delineated." She said that Plaintiff would likely miss more than four days a month, was not a malingerer, and could manage her own benefits if awarded (Tr. 142-45, 259-62).

Drs. Maxwell, Williams and Carter: G. David Maxwell, M.D., Mark Williams, Ph.D., and Michael Carter, Ph.D., all state agency non-examining consulting psychologists, reviewed the evidence as of September 21, 2005, and December 20, 2005, respectively, and concluded that Plaintiff had at most "moderate" work-related mental limitations, and that she retained the ability to perform simple (i.e., unskilled) work (Tr. 267-99).

On October 24, 2005, Dr. Fisher completed a questionnaire as the treating psychiatrist and listed Plaintiff's diagnoses as major depressive disorder (recurrent, moderate), an anxiety disorder, and another unspecified mental disorder (nonpsychotic), and noted that her GAF score was currently 62 and had been 76 at the highest over the past year. He felt she was not a malingerer and tended to minimize her symptoms since she disliked being "ill/weak." He suspected "an insidious mental/neuro disorder that w[ould] lead to further decline over the years," that her intellectual functioning appeared to be slowly declining, and that her anxiety and depression likely "aggravate[d] her migraines, and vice versa." He opined that she had "marked" restrictions in activities of daily living and social functioning, "extreme" deficiencies in concentration, persistence, or pace, and one or two extended episodes of decompensation. He also found that, due to her affective disorder, a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate. He felt she would miss work more than four days a month, and concluded that she

"marginally function[ed] socially and in her home due to intense anxiety, concentration problems and a severe sense of inadequacy all of which she struggles to hide 24/7," and that she could not handle funds in her own best interest (Tr. 89-92, 147-50).

Dr. Wimpey, treating neurologist, completed a headache questionnaire on November 17, 2005, stating that Plaintiff had a "migraine" every day for the past six months. He said that an MRI had been normal and that her symptoms could be explained by migraine or anxiety/tension. He said she was not a malingerer and that emotional factors contributed greatly to her headaches. He said medications had helped some without side-effects and that her prognosis was good. He opined that she was capable of low-stress jobs, her level of activity would depend on the headache's severity, she would miss work three times a month, and that he could not estimate how often she would need unscheduled breaks, but that when she did she would need to lie down and would need one day to rest before returning to work  (Tr. 151-56).

---

## ANALYSIS

As previously stated, Plaintiff argues that the ALJ erred in giving Dr. Fisher's opinions limited weight because his opinions were well-supported, consistent with the claimant's record as a whole, and should have been given controlling weight under the applicable statutes, rules and case law. (Pl. B. 29). Plaintiff also asserts that the ALJ ignored the findings of multiple doctors who opined that Plaintiff had been very significantly affected by anxiety and depression, was emotionally unstable, with poor coping skills and memory problems, was limited in her functioning because of emotional issues, and was severely incapacitated by depression and anxiety (Pl. R.B. 4). Plaintiff

disputes the ALJ's reasoning that Dr. Fisher's opinions were inconsistent with the weight of evidence of record, asserting, on the contrary, that they were in agreement with the opinions of Dr. Morris, Dr. Butryn, Dr. Robbins, and Ms. Carlton, LPC" (Pl.B.27).[2]

Plaintiff further asserts that the "ALJ failed to recognize that although the claimant did not meet the listing criteria for 12.04(C)(1), the claimant did meet the listing criteria for depressive syndrome." (Plaintiff's brief).

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with the other evidence in the record. 20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983)(a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."). Conversely, if a physician's opinion is not supported by medically-accepted clinical and laboratory diagnostic techniques and is not consistent with the other evidence in the record, it will not be given controlling weight. In evaluating how much weight should be given to the opinion of a physician, the nature and extent of the treatment relationship will be taken into account. Id. An ALJ, therefore, must explain his reasons for disregarding a positive

---

[2] As previously noted, Dr. H. Phillip Morris, Jr. of Athens, GA was one of Plaintiff's treating physicians from June 2000 - December 2005. Extensive treatment notes in the case record (Tr. 157-258) documented his diagnoses and treatment of Plaintiff's depression, anxiety, and headaches during that period. Dr. Paul Robbins of Moncks Corner, SC became one of Plaintiff's treating psychiatrists in September 2006. Treatment notes in the case record (Tr. 317-325) document his diagnoses of bipolar affective disorder, type II, and panic disorder and his treatment of Plaintiff from September - November 2006.

opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

In weighing the opinions of medical sources, the adjudicator must apply all of the factors in 20 CFR § 404.1527(d)(1)-(6), which are: examining relationship, treatment relationship; length of treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency, specialization, and other factors. Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) paraphrased the language of the regulations in holding that the adjudicator must consider "a non-exclusive list of factors pursuant to which the ALJ was obligated to evaluate and weigh medical opinions: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Hines, 453 F.3d at 563.

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, 739 F.2d at 989.

A review of the ALJ's decision reveals that he found the following with regard to Dr. Fisher's opinion of October 24, 2005:

Dr. Fisher's own treatment records show that the claimant responded well to

treatment with medication. While she complained of a breakdown in August 2005, other treatment notes in August 2005 reveal that the claimant reported that her depression and anxiety were "well controlled." Additionally, in August 2005, the claimant reported to the Social Security Administration that she was able to engage in a wide range of activities of daily living as described above . . . There is no evidence to indicate that the [physician] examined the claimant again following August 11, 2005, although he made his medical opinions with regard to the claimant's functioning abilities in late October 2005. Additionally, Dr. Fisher, when making these medical opinions was unaware that the claimant would not apparently require any medical treatment following October 2005 until June 2006. Accordingly, as these medical opinions are inconsistent with the weight of the evidence of record, the undersigned accords them limited weight, although they have been carefully considered.

(Tr. 22)

Plaintiff argues that the ALJ's factual findings with respect to Dr. Fisher's treatment and examination of Plaintiff were "simply inaccurate" (Pl.B. 27) because the first page of Dr. Fisher's multiple impairment questionnaire indicated that he *did* see Plaintiff after August 2005, i.e. on September 12 and October 4 (Tr. 147). A review of the Dr. Fisher's statement reveals that he indicated that he saw Plaintiff six times between May and October 2005, specifically on June 11, July 19, August 11, September 12, and October 4 even though the record does not seem to contain offices notes for the September 12, and October 4, office visits. Based on the medical opinions of Dr. Fisher and Dr. Wimpey plaintiff would meet the requirements for disability. Dr. Fisher and the counselor, Ms. Carlton, also stated that Plaintiff was not a malingerer, but had in fact minimized the severity of her symptoms for a long time. It appears that the ALJ attempted to discount the treating physician's opinions by choosing to pick out of Dr. Butryn's statement where he opined that based on some of her testing Plaintiff was malingering. However, the ALJ discounted the remainder of the opinion with regard to plaintiff's diagnosis and limitations. Furthermore, Dr. Fisher specifically stated in his impairment questionnaire "[o]verall treatment in this office has been fair; she dislikes

being ill/weak and has therefore minimized her symptoms resulting in impressions of doing better

(e.g. GAF 76), when in reality her response and functioning has been poor" (Tr. 147) and "I do not

believe, whatsoever, that she is malingering" (Tr. 148).

As stated, the ALJ relied on Dr. Butryn's statement that he opined Plaintiff was malingering

but did not give weight to the remainder of Dr. Butryn's report. Instead the ALJ found the following:

> Following a neuropsychological examination in April 2005, Dr. Matt Butryn opined
> that the claimant was able to understand and carry out simple instructions and tasks
> but could not understand and carry out complex task demands. Dr. Butryn also found
> that he claimant's ability to interact appropriately with the public, supervisors, and
> co-workers was limited but not precluded; that her ability to follow work routines
> and complete production expectations was minimal due to her slow pace of work,
> lack of motivation, and emotional instability; that the claimant's concentration and
> attention capacity were limited; that the claimant would likely decompensate under
> stressful conditions; that the claimant had a limited frustration tolerance level, and
> that, physically, the claimant would have difficulty sitting, standing, lifting, or carry
> heavy loads for extended periods of time due to her decreased stamina. The
> undersigned notes that Dr. Butryn examined the claimant only once, and thus, his
> medical opinions with regard to the claimant's functional limitations cannot be given
> as much weight as if he had a longitudinal relationship.

(Tr. 22).

Thus, the ALJ chose to rely on the one time statement that Plaintiff was malingering but did

not give weight to the remainder of Dr. Butryn's opinion. Viewed as a whole without taking pieces

of the report, it appears Dr. Butryn's opinions support the findings by Dr. Fisher. The undersigned

finds that there is no conflicting medical evidence cited by the ALJ which could justify ignoring the

opinions of Dr. Fisher which is supported by Drs. Morris, Dr. Robbins, and her counselor, Ms.

Carlton. Dr. Fisher's conclusions are also supported by Dr. Butryn with the exception of the

statement that Plaintiff was malingering. Otherwise, Dr. Butryn diagnosed Plaintiff with major

depressive disorder, recurrent, moderate to severe and generalized anxiety disorder, moderate to

severe. There is no contradictory evidence from an examining or treating physician/psychiatrist put forth by the ALJ to completely ignore the disability determination and functional assessment of Plaintiff by her treating psychiatrist and other treating physicians. Without any contradictory medical evidence or other persuasive contradictory evidence to contradict these reports, the undersigned finds that the ALJ should have given these opinions of the treating physicians proper weight. Deloatche, supra.

Additionally, Plaintiff argues that the ALJ abuse his discretion by not performing a proper Listing analysis. Plaintiff asserts that while the ALJ stated he considered Listing 12.00, he failed to complete a proper analysis. Plaintiff asserts that the ALJ failed to recognize that she met the listing criteria for depressive syndrome.

With respect to Step Four of the sequential evaluation, the ALJ found that Plaintiff did not meet or equal one of the listed impairments stating the following:

> Regarding Listing 12.00, the Administrative Law Judge finds, based upon a close review of the medical evidence, that there is a medically documented persistence, either continuous or intermittent, of a major depressive disorder, anxiety, and a headache disorder, which have resulted in mild to moderate restrictions in the claimant's activities of daily living; moderate limitations in her social functioning; moderate deficiencies of her concentration, persistence, or pace; and one episode of decompensation in work or work-like settings. Additionally, the medical evidence does not support a finding that the claimant suffers from any residual disease process that has resulted in such marginal adjustment at even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; a history of 1 or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement; or a complete inability to function independently outside the area of one's home. While the claimant's attorney has argued in her pre-hearing order that the claimant met the requirement of Listing 12.04C1, the evidence or record fails to support the claimant's depression has caused more than a minimal limitation in her ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support,. Instead treatment notes indicate that with treatment and the use of medication, the claimant's mental condition improved

significantly resulting in control of her symptomatology, as evidence by the medical record and the claimant's activities of daily living . . .

(Tr. 17).

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painfulconsequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symtomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

18

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Under the Listing analysis, the ALJ did not discuss 12.04 A and B. The ALJ only completed an analysis under Section 12.04C. The treating physicians opined that her limitations were moderate or marked. Ms. Carlton found moderate restrictions on activities of daily living, marked difficulties in social functioning, extreme deficiencies in concentration, persistence, and pace, and opined that Plaintiff had experienced four episodes of "not clearly delineated" decompensation (Tr. 144). Dr. Butryn found that Plaintiff's ability to follow work routines and complete production expectations is minimal due to a slow pace of work, lack of motivation, and emotional instability. Her concentration and attention capacity is limited. The client would likely decompensate under stressful conditions, and her tolerance for frustration is a major problem. Further, Dr. Butryn opined that Plaintiff's strength and stamina had declined and that she appeared emotionally unstable throughout

the evaluation. Dr. Butryn further opined that her prognosis was poor given the lifelong course of her problems and their severity level. He diagnosed Plaintiff with severe Generalized Anxiety Disorder and Major Depressive Disorder. Dr. Fisher found marked restrictions on activities of daily living and social functioning, extreme deficiencies in concentration, persistence, and pace, and one or two episodes of decompensation. (Tr. 149). The ALJ failed to conduct a proper analysis with respect to the Listings.

Under Step Five of the sequential evaluation in determining the residual functional capacity, the ALJ found that Plaintiff had severe impairments, but disagreed with the treating and examining medical sources on the extent to which Plaintiff was functionally limited by those severe impairments The ALJ found that Plaintiff had mild to moderate restrictions on activities of daily living, moderate restrictions on social functioning, moderate deficiencies in concentration, persistence, and pace, and found that Plaintiff had experienced one episode of decompensation (Tr. 17). The difference in the ALJ's findings and the medical sources' findings as to Plaintiff's functional limitations was a matter of the degree of those limitations. However, the ALJ does not cite to any examining or treating source to state how he arrived at this conclusions. The ALJ cannot substitute his opinion for that of the treating medical opinions.

The record before the court does not contain medical opinions from any other examining or treating source that significantly contradicts Dr. Fisher's opinions. Therefore, based on Dr. Fisher's conclusion which is supported by the other medical evidence, plaintiff's mental impairment meets both the "A" and "B" functional criteria for active symptoms for significant periods of time. The ALJ's decision is not supported by substantial evidence. Therefore, the undersigned concludes there is substantial evidence in the record, consisting of medical evidence together with the plaintiff's

testimonial evidence, that she meets the requirements of Listing 12.04. A claimant who has a severe impairment which meets or equals a listing, and who is not currently engaged in substantial gainful activity, is entitled to disability benefits. Durham v. Apfel, 34 F. Supp. 2d 1371 (N.D. Ga. 1999); see also Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984) (noting that a claimant's disability is established if his nonexertional condition is a listed impairment in the regulations).  Accordingly, reversal is appropriate and the plaintiff is entitled to benefits. Because reversal is warranted, it is unnecessary for this court to consider the other issues raised by the plaintiff.

## VI.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, 574 F.2d at 802.  Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock, 483 F.2d at 775.

The undersigned finds that the ALJ's decision was not supported by substantial evidence for the reasons discussed.  It is, therefore,

RECOMMENDED that the Commissioner's decision be REVERSED and benefits awarded.


Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge


August 12, 2009
Florence, South Carolina